IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Nakisha Renee Odom, | ) | C/A No.: 1:14-576-JMC-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be affirmed.

I.     Relevant Background

A.     Procedural History

On February 22, 2011, Plaintiff filed applications for DIB and SSI in which she alleged her disability began on November 30, 1996. Tr. at 118–20, 126–33. Her applications were denied initially and upon reconsideration. Tr. at 64–68, 72–73, 74–75.

On August 30, 2012, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Marcus Christ. Tr. at 26–53 (Hr'g Tr.). The ALJ issued an unfavorable decision on September 3, 2012, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 8–25. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–3. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on February 28, 2014. [ECF No. 1].

      B.    Plaintiff's Background and Medical History

          1.    Background

Plaintiff was 35 years old at the time of the hearing. Tr. at 19. She completed high school and obtained a special education certificate. Tr. at 31. Her past relevant work ("PRW") was as a cashier, a shirt presser, a cook helper, and a baker helper. Tr. at 48–49. She alleges she has been unable to work since February 23, 2011. Tr. at 29.

          2.    Medical History

Because the parties limited discussion in their briefs to Plaintiff's mental impairments and intellectual functioning, the undersigned summarizes only that evidence. *See* ECF Nos. 17 at 2 and 19 at 3.

Plaintiff underwent a psychological re-evaluation[1] on December 3, 1992. Tr. at 225–28. At the time of the evaluation, Plaintiff was enrolled in a self-contained learning

---

[1] The report is labeled "Psychological Re-Evaluation Report," but the record does not contain copies of earlier psychological evaluation reports. Tr. at 225.

disabled ("LD") program at North Charleston High School. Tr. at 225. Dianne Durst, Ph.

D. ("Dr. Durst"), the school psychologist, indicated recent test scores showed Plaintiff to

be performing on a beginning seventh grade level in math and a middle third grade level

in reading. *Id.* Dr. Durst noted that Plaintiff had previously been enrolled in a class for

the educable mentally handicapped ("EMH"), but that she was moved to a self-contained

LD class after her last two re-evaluations yielded low average performance IQ scores. *Id.*

Dr. Durst noted that Plaintiff's social skills fell in the borderline or below average range

and her communication skills were extremely low, but that her daily living skills were

average for her age. *Id.* Plaintiff was described as being easily distracted, having

difficulty beginning and completing assignments, and being withdrawn from the

classroom environment. *Id.* Dr. Durst administered the Wechsler Intelligence Scale for

Children, Third Edition ("WISC-III"), which yielded a verbal IQ score of 69, a

performance IQ score of 70, and a full scale IQ score of 67. Tr. at 227. Test results

indicated 90 percent confidence that Plaintiff's verbal IQ score ranged from 65–76, her

performance IQ score ranged from 66 to 79, and her full scale IQ score ranged from 64 to

73. Dr. Durst indicated Plaintiff "was cooperative during testing" and that "the

assessment results were considered to be a valid estimate of her potential for success in a

language-based school setting." Tr. at 226. However, Dr. Durst also noted that Plaintiff's

performance IQ score fell about one standard deviation below her last two evaluations

and lowered her overall full scale IQ score. *Id.* She suggested that the difference in scores

may be a product of the fact that the revised edition of the Wechsler Intelligence Scale for

Children ("WISC-R") was previously administered to Plaintiff. *Id.* She indicated

Plaintiff's Bender drawings were suggestive of borderline or below visual-motor development; that her achievement scores on the Woodcock Language Proficiency Battery suggested written language and reading skills at a beginning second grade level; that her social skills were in the borderline range; and that her communication skills were far below average. *Id.* Dr. Durst indicated current test results suggested Plaintiff was a "very high functioning EMH student" as opposed to a true LD student and that a change in her placement should be discussed. *Id.*

A staffing committee record dated February 17, 1994, indicated Plaintiff was having some difficulty meeting the objective of her then-current individualized education program ("IEP"). Tr. at 201. The reported suggested Plaintiff may be better served in an EMD setting, but that a decision would be made at the periodic review meeting. *Id.*

An IEP plan dated May 23, 1994, indicates Plaintiff's primary disability to be "learning disabled." Tr. at 207. Plaintiff was assessed to be performing math on a 4.8 grade level, reading on a 3.7 grade level, and engaging in written expression on a 4.2 grade level. Tr. at 207–08. The plan indicates no recommended change to Plaintiff's educational placement. Tr. at 207–11.

An IEP plan dated May 25, 1995, indicates Plaintiff was scheduled to graduate from high school on June 3, 1995, with a special education certificate. Tr. at 202–06. Plaintiff's primary disability was indicated to be "learning disabled." Tr. at 202. The Woodcock Johnson test was administered on May 1, 1995, and Plaintiff scored at the 5.4 grade level in calculation, the 3.6 grade level in passage comprehension, the 2.2 grade level in dictation, the 4.5 grade level in science, and the 7.0 grade level in social

studies/leisure. Tr. at 202–03. Comments indicate Plaintiff could multiple whole numbers, could comprehend above her assessed reading level, could write sentences, knew the functions of the root system, and knew the number of oceans. *Id.* The IEP committee members also noted that Plaintiff was employed, worked very hard at school and work, and got along well with friends during social events. *Id.*

On November 9, 2010, Plaintiff presented to the emergency department at St. Francis Hospital complaining of anxiety. Tr. at 242. She stated her anxiety symptoms began four weeks earlier and were accompanied by some chest discomfort. Tr. at 244. Plaintiff was prescribed Xanax and discharged. Tr. at 246.

On December 7, 2010, Plaintiff visited Jon Bosman, M.D. ("Dr. Bosman"), at Compass Health Systems for treatment of panic disorder and major depressive disorder. Tr. at 388–89. Dr. Bosman assessed a Global Assessment of Functioning ("GAF")[2] score of 55. Tr. at 389.

Plaintiff presented to the emergency department at St. Francis Hospital on December 10, 2010, for a psychiatric evaluation. Tr. at 234. Her positive symptoms included visual hallucinations, depression, anxiety, and sleep disturbance. Tr. at 235. She admitted she had not filled the prescription she received on November 9. Tr. at 236.

---

[2] The GAF scale is used to track clinical progress of individuals with respect to psychological, social, and occupational functioning. The GAF scale provides 10-point ranges of assessment based on symptom severity and level of functioning. If an individual's symptom severity and level of functioning are discordant, the GAF score reflects the worse of the two. Diagnostic & Statistical Manual of Mental Disorders-Text Revision (DSM-IV-TR) (2000).

Plaintiff was determined to pose no threat to herself or others. Tr. at 238. She was encouraged to fill her prescription and to follow up with a psychiatrist for further care. *Id.*

Plaintiff followed up with Dr. Bosman on January 20, 2011. Tr. at 390. She complained that Prozac made her cry and become very sleepy. *Id.* Her speech was normal and her thought process was appropriate, but she had a depressed and anxious mood and blunted affect. *Id.* She endorsed symptoms that included increased sleep and decreased appetite, motivation, and energy. *Id.* Dr. Bosman diagnosed major depressive disorder and panic disorder, discontinued Plaintiff's prescriptions for Prozac and Ambien, prescribed Trazodone and Lexapro, and assessed a GAF score of 60. *Id.*

Plaintiff followed up with Dr. Bosman three weeks later and stated that Xanax was not working as well and that she was tired frequently. Tr. at 391. She was described as depressed and anxious and she had a blunted affect. *Id.* Dr. Bosman changed Plaintiff's dosage of Xanax and assessed a GAF score of 60. *Id.*

Plaintiff underwent an initial psychiatric evaluation with Katherine Chemodurow, M.D. ("Dr. Chemodurow"), at the Institute of Psychiatry at the Medical University of South Carolina ("MUSC") on February 3, 2011. Tr. at 493–98. Plaintiff reported depression, anxiety, mood swings, restlessness, fatigue, poor concentration, low energy, and social anxiety. Tr. at 493–94. Dr. Chemodurow indicated Plaintiff demonstrated some evidence of paranoid delusions and had a circumstantial thought process. Tr. at 496. However, she described Plaintiff's memory and concentration as grossly intact and her insight and judgment to be fair. *Id.* She diagnosed major depressive disorder, first episode, severe, with possible psychosis; generalized anxiety disorder; social phobia; rule

6

out dysthymia; learning disorder, not otherwise specified ("NOS"); and borderline intellectual functioning, provisional. *Id.* She assessed a GAF score of 45 and indicated Plaintiff should continue individual therapy sessions. *Id.*

An outpatient psychiatric plan of care dated February 17, 2011, indicates Plaintiff's problems included depression and anxiety. Tr. at 332. She was diagnosed with major depressive disorder without psychosis, generalized anxiety disorder, and social phobia. Tr. at 333. Plaintiff's other diagnoses included learning disorder, NOS, and borderline intellectual functioning. *Id.* Plaintiff attended a therapy appointment with Dr. Chemodurow and reported significant anxiety and depression. Tr. at 487. She stated she was sleeping for seven to eight hours nightly. *Id.* She reported some mood lability and low energy, but good appetite and fairly good concentration. *Id.* Plaintiff's thought processes were logical and linear, but she endorsed some delusions and worried thoughts. Tr. at 488. Dr. Chemodurow indicated Plaintiff demonstrated mild improvement in depression in the context of a continued Lexapro trial. Tr. at 489. She assessed a GAF score of 50. Tr. at 490.

Plaintiff followed up with Dr. Chemodurow on March 3, 2011, and reported continued depression, with more depressed than non-depressed days. Tr. at 481. She complained of recent passive suicidal thoughts, daily crying spells, and low energy. *Id.* Plaintiff complained of panic attacks every three to four hours that lasted for roughly 30 minutes each time. *Id.* She reported excessive worry, but indicated she was able to leave her home to complete activities. *Id.* Plaintiff was well-groomed. Tr. at 482. She had fair

concentration and logical, linear, and appropriate thought processes and content. *Id.* Dr. Chemodurow assessed a GAF score of 50. Tr. at 483.

In March 2011, Plaintiff reported to Dr. Bosman that she continued to have panic attacks twice a day, while she was lying down. Tr. at 392. She also complained of difficulty sleeping. *Id.* Dr. Bosman changed Plaintiff's dosages of Trazodone and Lexapro and assessed a GAF score of 60. *Id.*

Plaintiff followed up with Dr. Chemodurow on April 5, 2011, complaining that she had recently been emotional because of ongoing arguments with her mother. Tr. at 476. Dr. Chemodurow described Plaintiff's energy, concentration, and grooming as fair. *Id.* Plaintiff's thoughts were logical, linear, and appropriate. *Id.* Her mood was emotional and her affect was mildly labile. Tr. at 477. Plaintiff endorsed worried thoughts, but denied panic attacks. *Id.* She stated she was sleeping for seven hours during a 24-hour period. *Id.* Dr. Chemodurow assessed a GAF score between 50 and 55. Tr. at 468.

In April 2011, Plaintiff reported to Dr. Bosman that she was a little emotional at times. Tr. at 393. Plaintiff was anxious and depression and her affect was blunted. *Id.* Dr. Bosman assessed a GAF score of 60. *Id.*

On April 21, 2011, Plaintiff presented to Dr. Chemodurow for a follow up appointment. Tr. at 471. She stated she had recently been to the emergency room because she was feeling emotional. *Id.* Plaintiff reported financial and familial stressors. *Id.* Plaintiff had fair energy and concentration. *Id.* She was well-groomed and indicated her appetite was "alright." *Id.* Her thoughts were logical, linear, and appropriate. *Id.* Plaintiff indicated she was sleeping for seven to eight hours per night. Tr. at 472. Dr.

Chemodurow described Plaintiff's insight to be fair and her judgment to be good. *Id.* She assessed a GAF score of 50–55. Tr. at 473.

In May 2011, Dr. Bosman noted Plaintiff's mood to be depressed and anxious and her affect to be blunted. Tr. at 394. He assessed a GAF score of 60. *Id.*

On May 17, 2011, Plaintiff reported to Dr. Chemodurow that she missed her last appointment because she had gallbladder surgery. Tr. at 464. Plaintiff reported that her mood was generally alright, but that she was frustrated at times. *Id.* She stated she had recently had several disagreements with her mother. *Id.* Dr. Chemodurow indicated Plaintiff was appropriately dressed and groomed and had fair energy, fairly good concentration, and a good appetite. *Id.* She described Plaintiff's thoughts as logical, linear, and appropriate. *Id.* Plaintiff's insight was fair and her judgment was good. Tr. at 465. Dr. Chemodurow assessed a GAF score of 50. Tr. at 466.

On May 19, 2011, Plaintiff underwent a psychological evaluation by Sherry Rieder, Ph. D. ("Dr. Rieder"). Tr. at 335–37. Dr. Rieder observed that Plaintiff drove herself to the appointment; was casually dressed with adequate hygiene and grooming; spoke normally; had normal posture and gait; demonstrated no psychomotor agitation or retardation and no physiological signs of anxiety; had normal thought processes and content; and demonstrated no difficulty with attention or concentration. Tr. at 335. Plaintiff indicated she awoke daily at 6:00 a.m. to get her children ready for school. *Id.* She indicated she drove her children to and from school. *Id.* She stated she was able to perform household tasks, but that she lived with her mother and her mother performed most of the household chores. *Id.* Plaintiff reported she was able to pay bills with cash.

*Id.* She wrote that Plaintiff's "performance on assessment tasks was notably inconsistent with her presentation today, work history, and past assessments" and "[a]s such, the results reported here are believed to significantly underestimate her abilities." Tr. at 335, 336. On the Wechsler Adult Intelligence Scale-Fourth Edition ("WAIS-IV"), Plaintiff's IQ scores were as follows: 66 for verbal comprehension, 58 for perceptual reasoning, 58 for working memory, 68 for processing speed, and 56 for full scale. Tr. at 336. On the Wide Range Achievement Test-Third Revision ("WRAT-3"), Plaintiff's reading and spelling abilities were assessed on a first grade level and she scored on a third grade level for arithmetic. *Id.* Dr. Rieder assessed the following diagnoses: rule out malingering, rule out major depressive disorder, rule out anxiety disorder, and borderline intellectual capacity. Tr. at 337. She assessed Plaintiff to have a GAF score of 65. *Id.* Dr. Rieder indicated Plaintiff had the "mental capacity to perform at least simple and routine work, such as the cashier work she has done in the past." *Id.*

On May 23, 2011, state agency consultant Michael Neboschick, Ph. D. ("Dr. Neboschick"), reviewed the evidence and completed a psychiatric review technique. Tr. at 338. He indicated Plaintiff had borderline intellectual functioning, major depressive disorder, and panic disorder. Tr. at 339, 341, 343. Dr. Neboschick assessed Plaintiff to have no restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. Tr. at 348. He indicated on a mental residual functional capacity ("RFC") evaluation that Plaintiff was moderately limited in her abilities to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for

extended periods, to complete a normal workday and workweek without interruptions from psychologically-based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods. Tr. at 352–53. He found Plaintiff was able to understand and remember simple instructions; to sustain attention for simple, structured tasks for periods of two hour segments; to adapt to changes; to make simple work-related decisions; to maintain appropriate appearance and hygiene; to recognize and appropriately respond to hazards; to work in the presence of others; and to accept supervision. Tr. at 354.

Plaintiff followed up with Dr. Chemodurow on June 3, 2011. Tr. at 461–63. She denied recent anxiety and depression, indicated her recent mood had been "okay," and stated she planned to move out of her mother's house in one to two months. Tr. at 461. Dr. Chemodurow indicated Plaintiff's concentration was "fairly good" and that her thought processes and content were logical, linear, and appropriate. *Id.* Plaintiff endorsed mild worry, but stated she had experienced no panic attacks since her last visit. Tr. at 462. Dr. Chemodurow assessed a GAF score of 55–60. Tr. at 463.

Plaintiff followed up with Dr. Bosman in July 2011. Tr. at 395. She stated her sleep and mood were good. *Id.* Dr. Bosman changed Plaintiff's Lexapro dosage and discontinued Buspar. *Id.* In September 2011, Plaintiff complained to Dr. Bosman that her medications were not working and that she was dragging. Tr. at 396. Plaintiff's symptoms included changes in sleep and appetite, decreased motivation and energy, and tearfulness. *Id.* Dr. Bosman prescribed Remeron and assessed a GAF score of 60. *Id.*

On July 12, 2011, Plaintiff indicated to Martha Karlstad, M.D. ("Dr. Karlstad"), that she had recently lost most of her support system. Tr. at 458. She stated that she had lived on her own since age 18, but had moved in with her mother seven months earlier. *Id.* She stated she would like to work again, but was applying for disability. *Id.* She indicated she would determine what to do regarding employment after her disability case was decided. *Id.* Dr. Karlstad described Plaintiff as having impaired concentration, but linear and appropriate thought content. *Id.* Plaintiff's appetite was good and her energy was fair. *Id.* Dr. Karlstad described Plaintiff's mood as depressed and her affect as anxious. Tr. at 459. She assessed a GAF score of 50 and directed Plaintiff to follow up every two weeks for supportive psychotherapy and possible cognitive behavioral therapy. Tr. at 459–60.

Plaintiff followed up with Dr. Karlstad on August 23, 2011. Tr. at 453–55. She reported that she continued to struggle with avoidance of her mother and a lack of independence. Tr. at 453. Dr. Karlstad observed Plaintiff to be depressed and anxious and demonstrate anhedonia, worried thoughts, and restless sleep. Tr. at 454. However, Plaintiff had good appetite, fair energy, linear thought processes, appropriate thought content, and fair judgment and insight. Tr. at 453–54. Dr. Karlstad assessed a GAF score of 50 and instructed Plaintiff to return in two weeks. Tr. at 455.

Plaintiff followed up with Dr. Karlstad on September 26, 2011. Tr. at 447–49. Dr. Karlstad indicated Plaintiff was "somewhat superficial and conversational for much of the encounter." Tr. at 447. Plaintiff was appropriately dressed and reported good appetite and concentration and fair energy. *Id.* Her thoughts were logical, linear, and appropriate.

12

*Id.* Dr. Karlstad indicated Plaintiff's mood was depressed and her affect was constricted. Tr. at 448. She assessed a GAF score of 50 and instructed Plaintiff to keep a thought journal. Tr. at 449.

On October 11, 2011, state agency consultant Olin Hamrick, Jr., Ph. D. ("Dr. Hamrick"), completed a mental RFC assessment in which he indicated Plaintiff was moderately limited with regard to the following abilities: to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to complete a normal workday and workweek without interruptions from psychologically-based symptoms; and to perform at a consistent pace without an unreasonable number and length of rest periods. Tr. at 400–01. Dr. Hamrick indicated Plaintiff was able to "understand and remember simple instructions; sustain attention for simple, structured tasks for periods of two hour segments; adapt to changes; make simple work-related decisions; maintain appropriate appearance and hygiene; recognize and appropriately respond to hazards; work in the presence of others; and accept supervision." Tr. at 402. Dr. Hamrick also completed a psychiatric review technique in which he considered borderline intellectual functioning, major depressive disorder, and panic disorder. Tr. at 406–19. He assessed Plaintiff to have no restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. Tr. at 416.

On November 14, 2011, Plaintiff followed up with Dr. Karlstad for therapy. Tr. at 445–47. Dr. Karlstad described Plaintiff as tearful and expressive when discussing

problems with her family and boyfriend. Tr. at 445. She indicated Plaintiff's mood and affect were sad, but her thoughts were goal-directed, coherent, and appropriate. *Id.* Dr. Karlstad indicated Plaintiff was struggling with a loss of independence and resources and an increased in anxiety following an incident in which her brother shot her boyfriend the previous December. Tr. at 446. She also indicated Plaintiff suffered from "somewhat debilitating social anxiety, which has interfered with her procuring employment." *Id.* She assessed a GAF score of 50 and indicated Plaintiff should continue to engage in supportive psychotherapy. *Id.*

Plaintiff followed up with Dr. Karlstad on December 5, 2011. Tr. at 443–45. Dr. Karlstad indicated Plaintiff's mood was depressed, but that her thoughts were goal-directed, coherent, and appropriate and that she had a low risk of self-harm. Tr. at 443. Dr. Karlstad indicated Plaintiff was having difficulty dealing with the anniversary of her brother shooting her boyfriend, but was coping adequately. Tr. at 444. She assessed a GAF score of 50 and instructed Plaintiff to continue with weekly supportive therapy sessions. *Id.*

On January 3, 2012, Plaintiff presented to Dr. Karlstad for supportive therapy. Tr. at 440. Dr. Karlstad described Plaintiff's mood as anxious and her attitude as cooperative, but frustrated. *Id.* She indicated Plaintiff's thoughts were goal-directed, coherent, and appropriate. Tr. at 441. She assessed a GAF score of 50 and instructed Plaintiff to follow up for supportive therapy in two weeks. *Id.*

On January 24, 2012, Plaintiff scored a 124 on the Liebowitz Social Anxiety Scale, which indicated severe social anxiety. Tr. at 436. Dr. Karlstad indicated Plaintiff's

mood was anxious, but that she was calm and cooperative and her thoughts were goal-directed, coherent, and appropriate. Tr. at 436–37. Dr. Karlstad assessed a GAF score of 50 and instructed Plaintiff to follow up for continued therapy in two weeks. Tr. at 437.

Plaintiff followed up with Dr. Karlstad on January 30, 2012, and discussed her goals to return to work and obtain her own housing. Tr. at 434. Dr. Karlstad described Plaintiff's mood as depressed, but indicated her thoughts were goal-directed, coherent, and appropriate. Tr. at 435. Dr. Karlstad indicated Plaintiff had a history of traumatic brain injury ("TBI") and probably mild cognitive impairment with significant social phobia. *Id.* She concluded Plaintiff was becoming more stable and engaged and could attempt cognitive behavioral therapy. *Id.* She assessed a GAF score of 50 and recommended biweekly cognitive behavioral therapy for social phobia. *Id.*

Plaintiff followed up with Dr. Karlstad on February 28, 2012. Tr. at 431–32. Dr. Karlstad indicated Plaintiff appeared more reserved and nervous than on previous visits. Tr. at 431. Plaintiff described her mood as "up and down" and indicated she had experienced increased anxiety and worry. *Id.* Plaintiff also indicated she was out of medication. *Id.* Dr. Karlstad assessed a GAF score of 50. Tr. at 432.

Plaintiff attended a therapy appointment with Lauren Yarrow, M.D. ("Dr. Yarrow"), on March 20, 2012. Tr. at 425–27. She stated she was experiencing significant anxiety as a result of her relationship with her boyfriend. Tr. at 425. Dr. Yarrow described Plaintiff's mood as anxious and irritable, but noted that she was alert, fully oriented, cooperative, and had goal-directed, coherent, and appropriate thoughts. Tr. at

426. Dr. Yarrow assessed a GAF score of 50 and instructed Plaintiff to return for a therapy session in one to two weeks. *Id.*

On April 18, 2012, Plaintiff told Dr. Yarrow she was on an emotional rollercoaster and having difficulty with her mother, brother, and boyfriend. Tr. at 422. Dr. Yarrow described Plaintiff as agitated and irritable. Tr. at 423. She assessed a GAF score of 50 and instructed Plaintiff to follow up in one week for therapy. Tr. at 424. Plaintiff failed to attend a psychiatric follow up appointment at MUSC on April 25, 2012. Tr. at 421.

C.     The Administrative Proceedings

1.     The Administrative Hearing

a.     Plaintiff's Testimony

At the hearing on August 30, 2012, Plaintiff testified she was terminated from her last job because she frequently missed work due to anxiety attacks. Tr. at 29. Plaintiff indicated that her employer did nothing to assist her when she experienced panic attacks on the job and that she had to continue working until the end of her shift. Tr. at 33. She testified that a doctor in the emergency room diagnosed her as having panic attacks and instructed her to remain out of work for a week. Tr. at 34. She stated she called her boss to inform him that she would be out of work for a week, but that the person with whom she left a message did not convey the information to her boss, and she was terminated. *Id.* Plaintiff indicated she applied for and received unemployment compensation after a six to eight-week waiting period. Tr. at 34–35.

Plaintiff testified she continued to experience panic attacks two to three times per week. Tr. at 37. She described her panic attacks as involving a thumping sound and

feeling like her heart was coming out of her chest. Tr. at 38. She stated her panic attacks were not triggered by any particular circumstances and occurred at random. *Id.* However, she later stated her panic attacks were likely to occur when she was around a lot of people. *Id.* She indicated she usually needed to sit or lie down for 30 to 45 minutes while experiencing a panic attack. *Id.*

Plaintiff testified she obtained treatment through Compass Carolina while she was insured through Aramark. Tr. at 36. She indicated she subsequently began treatment at MUSC. Tr. at 36. The ALJ asked her to explain the reasons for her missed appointments at MUSC. *Id.* Plaintiff indicated she missed appointments due to panic attacks and difficulty obtaining transportation. Tr. at 36–37.

Plaintiff testified she was enrolled in special education classes and obtained a certificate upon completion of high school. Tr. at 31. She indicated she could read on a second grade level. *Id.*

Plaintiff stated she had worked for Aramark as a cashier at a college food court for over two years. Tr. at 29. Plaintiff indicated she scanned items or selected them from pictures on her computer screen. Tr. at 32. She stated she did not handle money frequently because the customers typically paid with debit cards. *Id.* She indicated when she did handle money, she typically gave the customers too much change. *Id.*

Plaintiff testified that she was able to drive, but sometimes experienced panic attacks while driving. Tr. at 37. She stated she visited the grocery store early in the morning to avoid being around a lot of people. Tr. at 38. She indicated she listened to the television, but did not watch it. Tr. at 39. Plaintiff testified she had three children, ages

seven, thirteen, and fifteen. *Id.* She indicated she helped her children dress and prepare for school on most mornings, but failed to get up to help them on two to three mornings per week because of her depression. Tr. at 40. She stated she sometimes attended IEP meetings at her son's school. Tr. at 43. She indicated her sons played football, but she was unable to attend their games because of anxiety. *Id.* She stated she did not visit parks with her children. Tr. at 44. Plaintiff testified that she was a member of a church and served as a volunteer in the church nursery while she was working, but that she had not attended church in six or seven months. Tr. at 45. She indicated she had reduced her church attendance from weekly to twice a month before she stopped attending. *Id.*

Plaintiff testified she had recently moved from her mother's house to an apartment with her children. Tr. at 41. She stated she used her younger son's SSI benefit to pay her rent. *Id.*

b.    Vocational Expert Testimony

Vocational Expert ("VE") Mark Boatner reviewed the record and testified at the hearing. Tr. at 48–52. The VE categorized Plaintiff's PRW as a cashier II, *Dictionary of Occupational Titles* ("*DOT*") number 311.472-010, as light in exertional level and unskilled with a specific vocational preparation ("SVP") of two; a shirt presser, *DOT* number 363.685-026, as light in exertional level and unskilled with an SVP of two; a cook helper, *DOT* number 317.687-010, as medium in exertional level and unskilled with an SVP of two; and a baker helper, *DOT* number 313.684-010, as medium in exertional level and semiskilled with an SVP of three. Tr. at 48–49. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform medium work,

should avoid all exposure to unprotected heights, and was limited to simple, routine, repetitive tasks with only occasional changes in the work setting, no production rate or pace work, and only occasional interaction with the public. Tr. at 49. The VE testified that the hypothetical individual would be unable to perform Plaintiff's PRW. *Id.* The ALJ asked whether there were any other jobs in the regional or national economy that the hypothetical person could perform. *Id.* The VE identified unskilled jobs with a medium exertional level as a laundry laborer, *DOT* number 361.687-018, with 1,100 positions in the region and 310,000 positions in the national economy; a store laborer, *DOT* number 922.687-058, with 2,400 positions in the region and 500,000 positions in the national economy; and a creeler, *DOT* number 689.687-030, with 600 positions in the region and 145,000 positions in the national economy. Tr. at 50. The VE stated that the hypothetical would allow for performance of three-quarters of the occupational base of unskilled, medium work and would include about 650 specific job titles. Tr. at 51. The ALJ asked if there would be jobs available if, due to a combination of medical conditions and mental impairments, the individual were to be off task for more than an hour per day in addition to regularly-scheduled breaks. *Id.* The VE testified there would be no jobs. *Id.* The ALJ asked if there would be jobs available if, due to a combination of medical conditions including mental impairments such as panic attacks, the individual were to miss more than two days of work per month. *Id.* The VE indicated that absenteeism of two days per month was considered excessive and would not be tolerated. Tr. at 51–52.

2.    The ALJ's Findings

In his decision dated September 3, 2012, the ALJ made the following findings of

fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

2.    The claimant has not engaged in substantial gainful activity since February 3, 2011, the amended alleged onset date (20 CFR 404.1571 *et. seq.*, and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: depressive disorder, generalized anxiety disorder, social phobia, and a learning disorder (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c). Specifically, the claimant is able to lift and carry up to 50 pounds occasionally and 25 pounds frequently and stand, walk, and sit for 6 hours in an 8-hour day. She should avoid all exposure to unprotected heights. The claimant is limited [to] performing 1 or 2 step tasks in a low stress setting, defined as having only occasional changes in the work setting. She is restricted from performing production or pace work. She may only interact with the public occasionally.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on February 28, 1977 and was 19 years old, which is defined as a younger individual age 18–49, on the alleged disability onset day (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from November 30, 1996, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 13–20.

II.    Discussion

Plaintiff alleges the Commissioner erred because the ALJ did not properly consider Listing 12.05C. The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that

impairment meets or equals an impairment included in the Listings;[3] (4) whether such impairment prevents claimant from performing PRW;[4] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[4] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is

supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

Plaintiff argues the ALJ's finding that her impairment did not meet Listing 12.05C was not supported by substantial evidence. [ECF No. 17 at 7]. She contends the ALJ did not provide a sufficient explanation for his decision to discredit her 1992 IQ scores. *Id.* at 9–10. She also maintains that the ALJ relied on Dr. Rieder's unsupported opinion that Plaintiff had borderline intellectual functioning. *Id.* Plaintiff argues this court should ignore post hoc rationalizations advanced by the Commissioner to support the ALJ's findings. [ECF No. 20 at 2].

The Commissioner argues that substantial evidence supports the ALJ's finding that Plaintiff did not meet the requirements for a finding of disability under Listing 12.05C. [ECF No. 19 at 8]. She maintains the ALJ properly evaluated the IQ scores in the record and found them to be invalid, as permitted by the Fourth Circuit's decision in *Hancock v. Astrue*, 667 F.3d 470, 475 (4th Cir. 2012). *Id.* at 10–12. The Commissioner

also argues Plaintiff failed to prove that she had deficits in adaptive functioning, as required by Listing 12.05C. *Id.* at 12–13.

"[I]ntellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R., Pt. 404, Subpt. P, Appx. 1, § 12.05. To satisfy Listing 12.05C, the claimant must have "a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R., Pt. 404, Subpt. P, Appx. 1, § 12.05C. A claimant must prove that her impairment meets all three prongs for a finding of disability under Listing 12.05C, which means she must show deficits in adaptive functioning during the developmental period, a valid IQ score of 60 through 70, and another physical or mental impairment that causes an additional and significant work-related limitation of function. *See Hancock*, 667 F.3d at 475. If a claimant fails to satisfy any of these three prongs, a decision that she is disabled is not supported under Listing 12.05C. *Id.*

When the record contains conflicting IQ test scores, the ALJ must weigh the conflicting scores and explain his reasons for the weight he accords to each. *See Murphy v. Bowen*, 810 F.2d 433, 437 (4th Cir. 1987). In *Hancock*, the Fourth Circuit held that "an ALJ has the discretion to assess the validity of an IQ test result and is not required to accept it even if it is the only such result in the record." 667 F.3d at 474. The court considered language in the introduction to Listing 12.00 that provides the following: "since the results of intelligence tests are only part of the overall assessment, the narrative

report that accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and degree of functional limitation." *Id.*, citing 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00(D)(6)(a).

To satisfy the third prong under Listing 12.05C, a claimant must provide evidence of "an additional and significant work-related limitation of function." 20 C.F.R., Pt. 404, Subpt. P, Appx. 1, § 12.05C. Listing 12.00 provides that in assessing the criteria under Listing 12.05C, "we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities, i.e., is a 'severe' impairment(s), as defined in § 404.1520(c) and 416.920(c). 20 C.F.R., Pt. 404, Subpt. P, Appx. 1, § 12.00.

The ALJ determined that Plaintiff's severe impairments included depressive disorder, generalized anxiety disorder, social phobia, and a learning disorder, but he did not find intellectual disability to be a severe impairment. *See* Tr. at 13. The ALJ found that the paragraph C criteria of Listing 12.05 were not met because Plaintiff did not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment that imposed an additional and significant work-related limitation of function. Tr. at 15. He wrote the following:

> On IQ testing in December 1992 she obtained a verbal score of 69, performance score of 70, and full scale score of 67. (Exhibit 1F). More recent IQ testing was determined to be invalid due to the claimant's suboptimal effort (Exhibit 5F), which raises a question as to whether her scores from December 1992 are valid. Also, there is no evidence of other physical or mental impairments imposing significant work-related limitation of function. As discussed above, the objective evidence of record supports no more than moderate limitations.

*Id.* The ALJ concluded earlier in his discussion of the Listings that Plaintiff had mild restriction of activities of daily living because she awoke at 6:00 a.m. to prepared her children for school, drove them to and from school, performed personal hygiene tasks independently, and performed normal household chores. Tr. at 14. He found she had moderate difficulties in social functioning because, while she endorsed a history of social phobia and anxiety attacks, she cared for three children, had a boyfriend, and was cooperative and interactive during evaluations. Id. He concluded Plaintiff had moderate difficulties in concentration, persistence, or pace because, although she reported a history of anxiety attacks and was assessed with a learning disorder, records generally indicated she was alert and exhibited fair concentration and the May 2011 consultative exam showed she had the mental capacity to perform at least simple routine work. Id. When the ALJ assessed the B criteria under Listing 12.05, he noted that Dr. Rieder indicated Plaintiff's performance on the May 2011 IQ testing was "notably inconsistent with her presentation, work history, and past assessments thus resulted reported were an underestimate of her true abilities." Tr. at 15. In assessing Plaintiff's RFC, the ALJ further discussed the more recent IQ testing and noted that Dr. Rieder diagnosed borderline intellectual capacity and stated that "the claimant appeared to be a historian of questionable reliability thus diagnostic impressions based on her reports may not be dependable." Tr. at 18.

The record contains two IQ assessments, one performed in 1992 when Plaintiff was 15 years old and the other performed in 2011 when Plaintiff was 34 years old. *See* Tr. at 227, 335. The 1992 test yielded a verbal IQ of 69, a performance IQ of 70, and a

full scale IQ of 67. Tr. at 227. Plaintiff's school psychologist indicated that the results of testing were considered valid. Tr. at 226. However, she also noted that Plaintiff's performance IQ score fell about one standard deviation below her last two evaluations and lowered her overall full scale IQ and suggested that the change in scores might have been caused by the fact that a different test was administered. *Id.* On the second test, in May 2011, Plaintiff's IQ scores were assessed at 66 for verbal comprehension, 58 for perceptual reasoning, 58 for working memory, 68 for processing speed, and 56 for full scale. Tr. at 336. However, Dr. Rieder suggested Plaintiff was possibly malingering and gave suboptimal effort and diagnosed borderline intellectual capacity. Tr. at 337. The ALJ accorded no weight to the test scores derived in 1992 or 2011, but instead relied upon Dr. Rieder's opinion that Plaintiff had borderline intellectual functioning.[5] *See* Tr. at 18.

The undersigned recommends the court find that the ALJ's decision to accord no weight to Plaintiff's 1992 IQ scores was supported by substantial evidence. The ALJ explained his decision to accord no weight to either IQ test on Plaintiff's suboptimal effort in 2011, which raised concern regarding her effort in 1992. *See id.* Although Dr. Durst indicated Plaintiff's 1992 IQ test results were considered valid, she also indicated

---

[5] Plaintiff argues Dr. Rieder's opinion that she had borderline intellectual functioning was without any support. [ECF No. 17 at 9]. However, Dr. Rieder based her assessment on her observations of Plaintiff, Plaintiff's work history, and previous assessments. Tr. at 336. Although Dr. Rieder did not specify which previous assessments she reviewed, the record consistently supports a diagnosis of borderline intellectual functioning based upon Plaintiff's IEP and classroom placement, as well as provisional diagnoses provided by her treating psychiatrists. *See* Tr. at 202–06, 207–11, 225, 333, 423, 426, 429, 432, 435, 437, 438, 441, 444, 446, 448, 452, 454, 457, 459, 463, 464, 466, 471, 473, 476, 478, 481, 483, 486, 487, 490, 496.

that the results differed from the two prior tests. Tr. at 226. Dr. Durst suggested that Plaintiff be placed in an EMH program based on the test scores, but subsequent school records indicate Plaintiff remained in an LD program and that her diagnosis remained learning disabled as opposed to intellectually disabled. *See* Tr. at 202, 207. Based on evidence in the record regarding Plaintiff's performance prior to and subsequent to the 1992 testing, the undersigned recommends the court find that the ALJ reasonably questioned the validity of Plaintiff's 1992 IQ scores.

The undersigned further recommends the court find the ALJ's determination that Plaintiff did not have a valid verbal, performance, or full scale IQ between 60 and 70 to be supported by substantial evidence. Although the ALJ did not do so in the context of assessing whether Plaintiff met or equaled the requirements of Listing 12.05C, he referenced Plaintiff's daily activities, the observations of Plaintiff's treating psychiatrists, and Dr. Rieder's examination and opinion in other parts of his discussion at step three and in his analysis of Plaintiff's RFC and concluded that the evidence was not consistent with Plaintiff having an IQ of 70 or below. Tr. at 17–18. Thus, the evidence considered by the ALJ provided sufficient support for his decision to reject Plaintiff's IQ test scores and to find Plaintiff did not meet the second prong of Listing 12.05C. *See Hancock*, 667 F.3d at 475, citing *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) ("[A] valid I.Q. score need not be conclusive of mental retardation where the I.Q. score is inconsistent with other evidence in the record of the claimant's daily activities and behavior.").

The undersigned also recommends the court reject Plaintiff's argument that it cannot look to other parts of the ALJ's decision to determine whether he properly assessed Plaintiff's IQ scores under Listing 12.05C. *See* ECF No. 20 at 2–3. In *Smith v. Astrue*, 457 F. App'x 326, 328 (4th Cir. 2011), the court found that reading the decision as a whole yielded substantial evidence to support the ALJ's finding at step three. The court cited *Fischer-Ross v. Barnhardt*, 431 F.3d 729, 733–34 (10th Cir. 2005), which rejected a per se rule that failure to provide a sufficient explanation at step three required remand and held that an ALJ's findings at other steps of the sequential evaluation process may provide a basis for upholding a step three finding. *Smith*, 457 F. App'x at 328. Plaintiff argues that this case is distinguishable from *Smith* and *Fischer-Ross* and that no per se rule exists that allows the court to look beyond an ALJ's Listings analysis. [ECF No. 20 at 2–3]. *Smith* and *Fisher-Ross* addressed whether the court could look beyond the ALJ's step three analysis to determine whether his conclusion regarding a particular Listing was adequately supported. The undersigned agrees that this case is distinguishable from *Smith* and *Fisher-Ross*, but for different reasons than those advanced by Plaintiff and finds it unnecessary to look outside the ALJ's step three analysis to determine if his conclusion is supported. Plaintiff cites and the undersigned finds no case law that suggests the court cannot look to the entire step three analysis to determine a particular step three finding is supported by substantial evidence. Here, the ALJ adequately explained his conclusion that Plaintiff did not meet Listing 12.05C and his explanation at subsequent steps only reinforced his explanation at step three. Although the ALJ did not provide a detailed explanation for his conclusion that

Plaintiff's IQ was above 70 in his discussion of part C of Listing 12.05, he referenced his discussion of Plaintiff's daily activities, the findings of Plaintiff's treating psychiatrists, and the examination by the consultative psychologist in his general step three analysis and specifically cited the "objective evidence of record" that was "discussed above." *See* Tr. at 15. Therefore, while it is necessary to look beyond the specific discussion of part C of Listing 12.05, it is unnecessary for the court to look beyond the step three analysis to find justification for the ALJ's finding that Plaintiff did not meet Listing 12.05C. The ALJ's further explanation of his conclusion that Plaintiff did not have an intellectual disability in subsequent steps was not required and merely provided additional support for his explanation of his findings regarding Plaintiff's IQ test scores at step three.

The undersigned recommends the court find the ALJ erred in determining that Plaintiff's impairment did not meet the third prong under Listing 12.05C, but that the ALJ's error was harmless. Because the ALJ found that Plaintiff had severe impairments that included depressive disorder, generalized anxiety disorder, social phobia, and a learning disorder, he erroneously concluded that Plaintiff did not have another impairment that imposed an additional and significant work-related limitation of function. *See* 20 C.F.R., Pt. 404, Subpt. P, Appx. 1, § 12.00. Despite the ALJ's error in assessing the third prong, Plaintiff can prevail only if she establishes that the ALJ erred in his analysis of the first and second prongs, as well. *See Hancock*, 667 F.3d at 475. Plaintiff argues that the ALJ erred in failing to address the first prong and that substantial evidence indicated she had deficits in adaptive functioning. [ECF No. 17 at 10]. While the ALJ omitted discussion of whether Plaintiff had deficits in adaptive functioning prior

to age 22, it is unnecessary for the court to assess whether the record suggested

otherwise.[6] Because the ALJ's decision to invalidate Plaintiff's IQ scores was supported

by substantial evidence and the ALJ would have found that Plaintiff did not meet the

requirements under Listing 12.05C even if he had determined she met the first and third

prongs, the undersigned recommends the court find the ALJ's error in assessing the third

prong and his failure to address the first prong to be harmless. *See Mickles v. Shalala*, 29

F.3d 918, 921 (4th Cir. 1994) (affirming the Commissioner's decision "[b]ecause the ALJ

conducted the proper analysis in a comprehensive fashion and cited substantial evidence

to support his finding, and because there is no question but that he would have reached

the same result notwithstanding his initial error").

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the

Commissioner, but to determine whether her decision is supported as a matter of fact and

law. Based on the foregoing, the undersigned recommends the Commissioner's decision

be affirmed.

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

April 24, 2015                          Shiva V. Hodges
Columbia, South Carolina                United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

---

[6] Thus it is also unnecessary for the court to address Plaintiff's argument that it cannot be persuaded by the Commissioner's post hoc explanation that Plaintiff failed to demonstrate deficits in adaptive functioning. [ECF No. 20 at 2].

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).